## CONRAD SCHWARTZ v. THE STATE.

### No. 2977. Decided October 26, 1904.

**1.—Murder—Evidence—Objection to Must be Reserved by Bill of Exceptions.**

Unless objection to testimony is duly reserved by a proper bill of exceptions, it can not be considered or the court's ruling reviewed.

**2.—Charge of the Court—Latin Phrase Permissible.**

Where the court in his charge to the jury in his definition of murder committed in the perpetration of robbery made use of the Latin term "per se," such words being of universal use in the English language that they are part of the same and could not have misled a juror of ordinary intelligence, and which when eliminated from the charge, still leave the same intelligible, there was no error.

**3.—Evidence—Circumstantial But Well Connected.**

Where the evidence in a case of murder assessing the death penalty is circumstantial, but well connected and excludes every reasonable hypothesis, save that of the guilt of the defendant, the judgment should be affirmed.

Appeal from the District Court of DeWitt. Tried below before Hon. James C. Wilson.

Appeal from a conviction of murder in the first degree; penalty, death.

The deceased, Wm. A. Earle, was the night operator at Yorktown and had only been there a few days. He was shot and killed in the office at the station of the San Antonio Aransas 'Pass Railway on the

morning of June 7th, 1904. He was found dead at about 4 a. m., lying on his back, in the ticket office, with a pistol, or gun shot wound through his left breast, and another bullet cut his shirt collar, going into the floor, where the body lay. He was not armed. Tracks of a man were found leading up between some box cars on the side track and the cotton platform at the depot. The ground there was covered with dead coal cinders. These tracks led from the ticket office along between the box cars and the platform to its corner and then left the right of way of the railroad and apparently led across a piece of sandy ground to a hitching post at the rear of an oil mill, west of the station and about seventy steps therefrom. Guards were placed over these tracks and they were closely examined as soon as it was light enough to see. It was found that a horse had been tied to the hitching post and there was also evidence there that a man had mounted this horse. One of the horse tracks—the right front hoof—had a split in it. It had rained the night before and the tracks were plain, and the officers trailed them to the house of defendant's father, where defendant lived. They arrested him and found a pistol and some money in his trunk which corresponded with the money stolen; especially a slick quarter and a half dollar in silver, the latter having some scratches on it, by which it was partially identified as part of the money taken from the drawer at the office of the station. The pistol showed that it had been freshly fired, two chambers having been recently discharged and the balls of which corresponded in size to those found in the floor and with which deceased had been killed. Coal cinders were found on the bottom of defendant's boots; his tracks fitted those found between the box cars and the platform leading up to the place, where the horse had been tied to the hitching post. The horse making the peculiar track was defendant's horse and was found near the house in the pasture. Both the horse tracks and the boot tracks were thoroughly identified to be those of defendant's horse and the boots he wore. Other circumstances of minor detail were in evidence.

The deceased was last seen alive at about 1:17 a. m. on the morning of the homicide in the ticket office, attending to a passenger train going east. The next passenger train was due at 4:28 a. m. of that day. A man was seen standing outside of the ticket office in the dark just before the first passenger train arrived, who ran off as he was approached; this occurred while deceased was inside of the ticket office. Just after this first train had left, defendant was seen at the said railroad station. Defendant interposed an alibi, which he attempted to establish by his father and mother.

*W. B. Green* and *O. S. York,* for appellant.

*Howard Martin,* Assistant Attorney-General, for the State.

BROOKS, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at death.

The first and second grounds of the motion for new trial complain of the admission of the testimony of Julia Stevens, and the exhibition of a pair of boots in evidence, and while one of the jurors, Ed Zengerle, was looking at one of the boots with a magnifying glass, trying to find some traces of cinders on the bottoms of said boots, counsel assisting the State in the prosecution, left his seat at the bar and walked in the direction of said juror who had said boot and magnifying glass, and began to converse with said juror relative to the cinders on said boots, etc. Neither of these grounds of the motion are verified by any character of bill of exceptions; hence they cannot be reviewed.

The third ground insists that the court erred in admitting the language of defendant's father to his son on June 7th, in the presence of the officer, when defendant was under arrest by the officers and had not been legally warned by said officers. This complaint is not verified by bill of exceptions.

The last ground of the motion complains of the eleventh paragraph of the court's charge, and as the words "per se" used in said charge were calculated to mislead and confuse the jury, as the law requires the charge of the court as well as the indictment to be in the English language and to be in plain and intelligible words. The paragraph complained of reads as follows: "If any person in the perpetration or in the attempt to perpetrate a robbery upon another, shall take the life of such other, he shall be deemed guilty of murder, and murder committed in the perpetration of robbery or in the attempt to perpetrate robbery is per se murder of the first degree." It is true, as appellant insists, the words "per se" are Latin, but they are of universal use in the English language, and are properly considered as a part of our language, though derived from the Latin; and no juror of ordinary intelligence could be misled by these terms. Furthermore, the words can be discarded in the charge and leave the sentence altogether intelligible and a proper charge, since all murder committed in the endeavor to perpetrate robbery is murder in the first degree—made so by statute. And if there was any juror who did not understand the words, "per se," as insisted by the appellant, the connection in which the words are used clearly and intelligently inform the jurors of the law, regardless of whether he understood the import of the words. While the writer believes that Latin is often the expedient of the pedant and refuge of mediocrity, yet in the use of the words here, there is no manifestation on the part of the trial judge to display his learning or to conceal his meaning, but it is readily apparent what he intended to say. We do not think that the charge was in the least degree calculated to mislead the jury.

The evidence, while circumstantial, is well connected, and excludes every reasonable hypothesis save and except the guilt of appellant. It shows, in substance, that appellant went to the station house for the purpose of murdering the agent in order to secure what money the agent might have in his possession. Money was found in appellant's possession and reasonably well identified. The presence of defendant at the

scene of the assassination, his tracks leading therefrom, the tracks of his horse, and various other circumstances not necessary to here detail, show with the utmost accuracy that appellant and no one else committed this dastardly crime. So believing, the judgment should and must be affirmed.

*Affirmed.*

Davidson, Presiding Judge, absent.